UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-60190-cr-BLOOM

UNITED STATES OF AMERICA

vs.

EDGAR ESTARLIN PERALTA LOPEZ,

Defendant.
_____/

## FACTUAL PROFFER

The undersigned parties agree that, had this matter proceeded to trial, the United States would have proven the following facts, in addition to others, beyond a reasonable doubt:

From at least August 2009 through at least January 2013, the defendant, Edgar Estarlin Peralta Lopez, knowingly and willfully participated in a scheme to commit wire fraud and a conspiracy to commit wire fraud; access device fraud; the use, production, and possession of modified telecommunication devices; and the use and possession of hardware and software configured to obtain telecommunications services. The object of the conspiracy was to make money by routing telephone communications through cellular telephone accounts that the conspirators were not authorized to use without paying the cellular telephone carriers servicing those accounts for the services that they provided.

As part of the scheme, conspirators used various means to obtain telecommunication identifying information – including electronic serial numbers ("ESNs"), mobile telephone numbers ("MTNs"), and mobile identification numbers ("MINs") – associated with cellular telephone accounts belonging to, or fraudulently opened in the names of, other people. Each of these pieces of telecommunication identifying information uniquely identified a specific telecommunications instrument or account. Conspirators would use techniques such as

"phishing" (using a fake website or emails to pose as a legitimate company to defraud a customer of that company into disclosing personal and account information) or "social engineering" (manipulating people as part of a fraud scheme into performing certain actions or divulging confidential information).

The conspirators employed this information to acquire control of cellular telephone accounts for use in the fraud. In some instances, conspirators would use stolen personally identifiable information of an individual to establish a new cellular telephone account in the individual's name without his or her permission. In other instances, conspirators would use personally identifiable information to access an individual's existing cellular telephone account without authorization and make unauthorized changes to the account by causing the cellular telephone carrier to add new sub-accounts or to change the electronic serial number of the telephone associated with the individual's existing account. Once the conspirators, including the defendant, had obtained the telecommunication identifying information associated with these compromised accounts, they would distribute that information to other members of the conspiracy through e-mail, Internet chat, and other electronic means.

Members of the conspiracy used telephone programming hardware and software to re-program or "clone" cellular telephones with the telecommunications identifying information associated with the compromised accounts. By doing so, the re-programmed cellular telephones could make telephone calls using the network of the cellular telephone carrier associated with the compromised account. Calls made on these re-programmed cellular telephones would appear to the carrier as if they were being made by the customer listed on the account. The bills for these calls went to the customers whose accounts had been compromised or the person whose identity had been stolen to create the account.

The various members of the conspiracy played different roles in carrying out the fraud and had different responsibilities. First, as described above, some conspirators stole personally identifiable information from individuals around the United States, which they used to take over existing cellular telephone accounts or open fraudulent new accounts. They would use this access to the compromised accounts to obtain the telecommunication identifying information associated with the accounts. These conspirators were Identity Thieves.

Second, some conspirators, including the defendant, sent telecommunication identifying information associated with the compromised accounts – which the conspirators referred to as "lines" (or, in Spanish, "lineas") – to other conspirators who operated locations ("call sites") with large numbers of cellular telephones. These conspirators who provided the lines were Line Suppliers.

Third, the conspirators who ran the call sites were Call Site Operators. Call Site Operators received telecommunication identifying information from Line Suppliers and cloned cellular telephones at their call sites with that information. The Call Site Operators then connected these re-programmed cellular telephones to equipment that was further connected to the Internet.

Fourth, other conspirators, including the defendant, routed thousands of international telephone calls, on behalf of telecommunications service providers, over the Internet to the call sites operated by others. These conspirators were Traffickers. At the call site, these telephone calls were routed through the re-programmed cellular telephones. The cellular telephone carrier for the account whose information had been re-programmed into each cellular telephone would connect the call to its international destination, mistakenly believing that it had been placed by one of its legitimate customers. In doing so, the cellular telephone carrier would incur the expenses of completing the calls. However, because the calls were not actually made by their customers,

the carriers generally did not require the customers to pay for the calls, and thus the carriers were not compensated for the service they provided. The conspirators would share amongst themselves payments received by the telecommunications service providers whose calls they routed without having to pay the costs of completing the routed calls.

In addition, some conspirators performed more than one role in the conspiracy. For example, the defendant was a Line Supplier, emailing "lines" to Call Site Operators working in Broward and Palm Beach Counties, within the Southern District of Florida. The defendant was also a Trafficker, routing calls to those call sites.

In or around August 2009, the defendant met Edwin FANA while FANA was in the Dominican Republic. Within a few days, the defendant referred FANA to Ramon BATISTA, who operated a company called Arymyx, Inc. ("Arymyx"), to discuss a way FANA could make money when FANA returned to the United States by using cellular telephones to offer long distance service. Through Arymyx, BATISTA routed telephone traffic going to relatively high-cost international destinations such as Cuba, Jamaica, and the Dominican Republic to call sites on behalf of other Traffickers and telecommunications service providers. BATISTA explained to FANA and the defendant that, as a Call Site Operator, FANA would transmit these calls through cellular telephones that FANA would re-program and maintain. FANA subsequently established a call site at his residence in Miami-Dade County, Florida.

BATISTA explained to FANA that the telecommunication identifying information he would receive was coming from telephone companies. BATISTA also warned that the telephone companies would shut down the "lines" used to re-program the cellular telephones. As a result, FANA needed to check each re-programmed cellular telephone every 10-15 minutes in order to make sure that it was still working. When the telephone company shut down a "line," FANA

needed to re-program that cellular telephone with information associated with a different account. BATISTA further warned FANA that he should not let anyone know about the equipment in his residence or that he was re-programming telephones. BATISTA also instructed FANA to use Sanyo model 8100 and 8200 cellular telephones, which are older model "flip" style cellular telephones, because they were easy to reprogram. Subsequently, BATISTA left for the United States but the defendant remained in the Dominican Republic.

BATISTA provided FANA with equipment to use at FANA's call site in order to handle traffic directed to FANA by BATISTA. However, FANA eventually purchased his own equipment and began receiving both "lines" and traffic from the defendant. As part of the fraud scheme, the defendant owned and used at least two email accounts: odimar_21@hotmail.com and edgarperaltalopez@hotmail.com. In fact, using his edgarperaltalopez@hotmail.com and odimar_21@hotmail.com email accounts, the defendant sent numerous e-mails to FANA with information to carry out the fraud. Beginning at least as early as April 2010, the defendant communicated with FANA about "lines" used in the scheme using his edgarperaltalopez@hotmail.com account. Between April 7, 2010 and May 10, 2012, FANA sent the defendant approximately 382 e-mails containing telecommunications identifying information, reporting quantities of minutes used and dollars owed, and reporting that specific "lines" were no longer working. For example, on May 11, 2010, FANA sent an email to the defendant's edgarperaltalopez@hotmail.com address listing twenty-three sets of telecommunications identifying information. On July 4, 2011, FANA sent an email to the same address containing two sets of telecommunications identifying information, indicating that both were "buena" (meaning that both were functioning). By contrast, on July 19, 2011, FANA sent the defendant an email with three sets of telecommunications identifying information, with an "m" next to all

three. The "m" stood for "mala," meaning that the lines were not working.

The defendant also communicated with FANA using the odimar_21@hotmail.com account. For example, on October 13, 2011, the defendant sent FANA an email containing several sets of telecommunications identifying information, accompanied by, in some instances, the customer name, provider, and cell phone type associated with the account. In addition to providing FANA with fresh "lines," the defendant – like BATISTA – routed telephone traffic going to relatively high-cost international destinations such as Cuba, Jamaica, and the Dominican Republic through FANA's call site on behalf of other Traffickers and telecommunications service providers. The defendant paid FANA to transmit this fraudulent telephone traffic.

Besides FANA, the defendant supplied lines to other Call Site Operators, including Braulio DE LA CRUZ VASQUEZ and Jose SANTANA, who operated call sites in Palm Beach County, Florida. The defendant regularly sent DE LA CRUZ VASQUEZ emails containing personal information about cellular telephone customers and cellular telephone lines and frequently paid him for his efforts. Between October 2011 and December 2012, the defendant and DE LA CRUZ VASQUEZ exchanged at least 610 emails containing telecommunication identifying information.

In the emails the defendant sent, the stolen telecommunications identifying information was grouped into sets or combinations, so that the ESNs, MTNs, and MINs for a particular account appeared either on the same line together or on adjacent lines. Individual emails contained sets of telecommunications identifying information for as few as one or two accounts or as many as forty accounts. In some instances, the emails would label each number, identifying it as an ESN, MTN, or MIN (or the equivalent). For example, on February 4, 2012, the defendant sent an email, using his email address odimar_21@hotmail.com, to DE LA CRUZ VASQUEZ with the subject line "FW: manos al obra con los 10bn." The body of the email listed ten groups, labeled from

one to ten, each with three numbers. Each number was labeled with the appropriate label for that particular type of telecommunications identifying information, namely, "MDN (Phone number)" (MDN is another term for MTN), "MSID (IMSI)" (MSID and IMSI are both other terms for MIN), and "ESN Hex/Dec/Sim." Seven of these groups of telecommunications identifying information were associated with Sprint accounts. These seven accounts belonged to four different subscribers, all of whom were listed as residents of New Jersey. Beginning approximately two hours after the defendant sent this email to DE LA CRUZ VASQUEZ, at least three of these accounts began making numerous calls to the Dominican Republic and various other Caribbean countries, until Sprint terminated the accounts several hours later.

On July 17, 2012, the defendant received an email from DE LA CRUZ VASQUEZ with the subject "braulio," which contained four "lines" of telecommunications identifying information. One of these "lines" included an MTN of XXX-XXX-9220, which was assigned to a Verizon Wireless account opened in the name of Co.S., a real person living in Chula Vista, California, on June 29, 2012. Co.S. did not authorize anyone to open this account in her name. Verizon Wireless found that this number was used to make $12,617 in fraudulent calls. The defendant knew that this, and other telecommunications identifying information he had sent and received, was associated with accounts belonging to, or established using the identities of, real people. This email was sent for the purpose of advising the defendant what "lines" were functioning, in furtherance of the scheme to defraud. This email, like other emails sent in furtherance of the scheme, were transmitted in interstate and foreign commerce, traveling between the defendant, who resided in the Dominican Republic, through Microsoft's servers outside the state of Florida, and DE LA CRUZ VASQUEZ, who resided in Florida.

In addition, the defendant sent numerous "lines" with compromised telecommunications

identifying information to SANTANA. For example, on October 15, 2011, at approximately 3:03 p.m., the defendant sent SANTANA an email at SANTANA's perez2521@hotmail.com account with the subject "FW: 2 vz 011." The email contained two group of telecommunications programming information. One group included an MIN of XXX-XXX-1081, along with an associated ESN and MTN. This information matched the telecommunications identifying information associated with a Verizon Wireless account that had been opened in the name of "Ch. S.," a real person residing in Wilmington, Delaware. The real "Ch. S." did not open this Verizon Wireless account; nor did he authorize anyone to open and use a Verizon Wireless account in his name. At approximately 3:24 p.m., 21 minutes after the defendant's email to SANTANA, a telephone using the account opened in "Ch. S.'s" name began making unauthorized international calls through a cellular tower located approximately two miles from SANTANA's residence in West Palm Beach (which was also the closest Verizon Wireless cellular tower to SANTANA's residence). In total, approximately 205 unauthorized calls were made through this cellular tower using this account within 48 hours, before Verizon Wireless shut down the account on October 17. The account was also used to make an additional 253 unauthorized calls through cellular towers in western Miami during the same time. Verizon Wireless suffered a loss of more than $11,000 from these calls.

The other group of telecommunication identifying information that SANTANA received from the defendant in the October 15, 2011 email described above was for an account with MIN XXX-XXX-8146. This account was opened in the name of "S.P." of Philadelphia, Pennsylvania. On October 15, 2011, at approximately 3:25 p.m., approximately 22 minutes after SANTANA received the defendant's email, a telephone using this account began making international calls to Cuba from the same cellular tower located approximately two miles from the defendant's

residence. Seventy-five such calls were placed through this cellular tower before Verizon Wireless shut down the account the following day, October 16, 2011. An additional 106 similar calls were placed from the Miami area. Verizon Wireless suffered a loss of more than $10,000 from these calls.

Some of the telecommunications identifying information that the defendant sent to FANA, DE LA CRUZ VASQUEZ, SANTANA, and others came from Farintong CALDERON. CALDERON had devised a method of identifying active ESNs by "incrementing" or changing known working ESNs until he discovered another working account; he could then clone a cell phone using the discovered account. CALDERON began selling his lines to individuals in the Dominican Republic for the purpose of cloning cell phones. CALDERON met the defendant in the Dominican Republic and agreed to sell "lines" to the defendant for a weekly payment.

Between October 29, 2011, and October 11, 2012, CALDERON and the defendant exchanged more than 400 emails containing ESNs and MTNs or MINs. In most of these emails, the CALDERON sent the defendant one or more ESNs, with associated MTNs or MINs, with little or no other commentary. The emails had subject lines indicating how many "lines" were contained therein, such as "3 mas" (i.e. "3 more"). Other emails also included the notation "jama," indicating that the "lines" should be used to route telephone calls going to Jamaica. The defendant would subsequently forward the "lines" to Call Site Operators. The defendant would also respond to CALDERON with emails noting which lines were "buena" (i.e. "good") or "mala" (i.e. "bad"). Such notations would indicate to CALDERON which lines he had sent were working and which ones were not. The defendant would similarly send CALDERON emails with the notation "s f" or "se fueron" next to certain lines. These notations would indicate that lines that had been working had stopped working. The defendant paid CALDERON weekly for sending

Page 9 of 12

him lines by depositing money in CALDERON's bank account; the amount CALDERON earned was based on how much of the defendant's fraudulent traffic passed through CALDERON's "lines," which the defendant could track and monitor using tools such as "soft switches."

CALDERON also provided "lines" to both FANA and BATISTA as well. That compromised telecommunications identifying information from CALDERON would then be used to program cellular telephones at call sites and used to transmit fraudulent international telephone calls, including traffic provided by the defendant. Moreover, the defendant provided equipment to CALDERON for the scheme through another individual.

As discussed in more detail above, the defendant agreed with FANA, BATISTA, DE LA CRUZ VASQUEZ, SANTANA, and CALDERON and others to commit wire fraud; access device fraud; the use, production, and possession of modified telecommunication devices; and the use and possession of hardware and software configured to obtain telecommunications services. The defendant knew the unlawful purpose of the plan and willingly joined it and, during the conspiracy, conspirators engaged in the overt acts described above and in the indictment. These overt acts were committed to help accomplish the object of the conspiracy.

In conspiring to commit wire fraud, the defendant agreed to participate in a scheme to defraud and obtain money and property by using false pretenses, representations, and promises about material facts. He acted with intent to defraud, and he transmitted by wire communications in interstate or foreign commerce to help carry out the scheme to defraud. In conspiring to commit access device fraud, the defendant used numerous unauthorized access devices to obtain things of value totaling $1,000 or more during a 12-month period, and his conduct affecting interstate or foreign commerce. These access devices included ESNs, MTNs, MINs, and other means of account access that could be used alone or in conjunction with another access device to obtain a

thing of value, and they were unauthorized because the defendant used them with intent to defraud. The defendant committed access device fraud for personal financial gain and to cause financial loss to someone else.

In conspiring to use, produce, and possess modified telecommunication devices, the defendant agreed to knowingly use, produce, and possess telecommunications instruments, namely, cellular telephones at his co-conspirators' call sites, that had been modified and altered to obtain unauthorized use of telecommunications services. He did so with intent to defraud, and his conduct affected interstate or foreign commerce. In conspiring to use and possess hardware and software configured to obtain telecommunications services, the defendant agreed knowingly to use and possess hardware and software that had been configured to modify telecommunication identifying information associated with or contained in telecommunications instruments, namely, cellular telephones, so that the telephones could be used to obtain telecommunication services without authorization. The defendant knew that the hardware and software had been so configured, and his conduct affected interstate or foreign commerce.

By receiving the July 17, 2012 email described above, the defendant committed wire fraud. He knowingly participated in a scheme to defraud and obtain money and property by using false pretenses, representations, and promises about material facts. He acted with intent to defraud, and he caused to be transmitted by wire a communication in interstate or foreign commerce to help carry out the scheme to defraud.

During and in relation to the wire fraud committed on July 17, 2012, as described above, the defendant committed aggravated identity theft. Specifically, he knowingly transferred, possessed, and used another person's means of identification without lawful authority. That means of identification was an MTN of XXX-XXX-9220 belonging to Co.S.

Moreover, the defendant admits that, using his odimar_21@hotmail.com and edgarperaltalopez@hotmail.com e-mail accounts, he sent or received from other co-conspirators approximately 3,158 combinations of telecommunication identifying information for specific cell phone devices or accounts belonging to individuals around the United States, and that the loss amount for each of these unauthorized access devices is not less than $100, making a loss amount of at least $315,800.

In addition, the defendant admits that the offense involved 10 or more victims, involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and involved the production or trafficking of unauthorized access devices.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 11/18/19     By: _____
                        JARED M. STRAUSS
                        ASSISTANT UNITED STATES ATTORNEY

Date: 11/18/19     By: _____
                        MATTHEW A. LAMBERTI
                        SENIOR COUNSEL—U.S. DEP'T OF JUSTICE

Date: 12/13/19     By: _____
                        JOSEPH S. ROSENBAUM
                        ATTORNEY FOR DEFENDANT

Date: 12-11-2019   By: _____
                        EDGAR ESTARLIN PERALTA LOPEZ
                        DEFENDANT